UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Daniel Brody,

       Plaintiff,

v.                                                                     Civil No. 07-4208 (JNE/JJG)
                                                                       ORDER
Starbucks Coffee Company,

       Defendant.

---

Ruth Y. Ostrom, Esq., appeared for Plaintiff Daniel Brody.

Joseph G. Schmitt, Esq., and Mark J. Girouard, Esq., Halleland Lewis Nilan & Johnson, P.A., appeared for Defendant Starbucks Coffee Company.

---

Daniel Brody claims that his former employer, Starbucks Coffee Company,[1] violated the Family and Medical Leave Act (FMLA) by failing to provide him with notice of his rights under the Act; disciplining him and placing him on a performance improvement plan after he returned from FMLA leave; failing to restore him to the same position he held before his FMLA leave or its equivalent; and terminating his employment. *See* 29 U.S.C. §§ 2614(a), 2615, 2619 (2006). The case is before the Court on Starbucks Coffee's Motion for Summary Judgment. For the reasons set forth below, the Court grants the motion.

## I.      BACKGROUND

Starbucks Coffee hired Brody in June 2005 as a store manager and assigned him to its store in Brooklyn Center, Minnesota. As a store manager, he reported to a district manager. From January 2006 to April 2007, Katrina Binns was the district manager to whom Brody

---

[1]      During this litigation, the parties referred to the defendant as either "Starbucks Coffee Company" or "Starbucks Corporation, d/b/a Starbucks Coffee Company." The Court refers to the defendant as Starbucks Coffee Company, the name that appears in the Amended Complaint.

reported.  Pursuant to Starbucks Coffee's general practice of reviewing employees near the

midpoint of fiscal year, Binns reviewed Brody in April 2006.  In that review, which did not

require Binns to give numerical ratings, Binns praised certain aspects of Brody's performance

and criticized others.  Near the end of Starbucks Coffee's fiscal year, Binns gave another

performance review to Brody in September 2006.  That review required Binns to numerically

rate Brody in several categories on a three-point scale.  The ratings indicated that Brody met

Starbucks Coffee's expectations in each of four "key responsibilities," consistently exceeded its

expectations in three of five "core competencies," met its expectations in one of the five core

competencies, and needed improvement in the remaining core competency.  Overall, Binns

indicated that Brody was meeting Starbucks Coffee's expectations.  Like the April 2006 review,

the September 2006 review included a mix of positive and negative comments about Brody's

performance.

A few months later, in January 2007, Binns had a "coaching conversation" with Brody.

In her documentation of the conversation, Binns described deficiencies in Brody's performance:[2]

> This document constitutes a coaching conversation for a performance issue.  Over the past several weeks/months, [Brody] has demonstrated poor decision making and failure to meet expectations previously agreed upon related to both his partners and his business . . . .  These decisions, as well as the impact on his store, business, and personal development, have been discussed with [Brody] by his [district manager] prior to this documentation.  Coaching has been provided to aid [Brody] in his development and to help change behavior, although [he] has yet to consistently incorporate this coaching/feedback.  This documentation is to ensure that [Brody] understands the communication that was provided to him and understands where his opportunities lie.  [His] performance will continue to be monitored and improved performance will be recognized/reinforced.  Similarly, further demonstration of poor decision making or failure to meet agreed upon expectations will result in corrective action.

Binns continued by listing examples of Brody's deficiencies and issuing an action plan to

improve his performance over the next thirty to sixty days.

---

[2]   Starbucks Coffee refers to its employees as "partners."

In March 2007, Binns again reviewed Brody's performance. She did not numerically rate his performance; her comments identified several concerns. With regard to "Leadership," one of the four key responsibilities, Binns noted that Brody had "displayed a customer comes first attitude by role modeling his expectations in the areas of customer care for his partners and setting expectations for them surrounding customer care and legendary customer service." Nevertheless, Brody "was challenged over the last 6 months to consistently hold his partners accountable for the expectations he set for them in this area, resulting in an inconsistent customer experience and inconsistent snapshot results." Although Brody "consistently placed importance on customer focus, he also occasionally engaged in 'us-vs-them mentality' discussions with his partners." He "delegated tasks appropriate to each partner's role," but "his delegation often resulted in partners failing to successfully complete the task, either as a result of unclear direction, little follow-up or no end accountability." Brody "continued to communicate with store partners and peers in a way that supported and promoted the Starbucks culture, values and mission statement, effectively recruiting external talent into the company and developing interest in career advancement with his store partners." He "occasionally struggled to understand and/or support changes in direction from the company . . . and occasionally expressed these concerns in an inappropriate manner or setting."

With regard to planning and execution, another key responsibility, Binns wrote, "Over the past six months, [Brody] continued to work on developing and sustaining a store system for posting weekly and monthly communications in clear view for all partners in order to help ensure partner awareness." However, Brody "was challenged to provide the follow-up necessary to ensure that information was reaching all store partners in a timely and effective manner," which "prevented him from holding his shift team accountable for the agreed upon responsibility

of cascading information to the team, resulting in a system that lacked sustainability and long-term effectiveness."

As to business requirements, the third key responsibility, Binns noted that Brody "regularly utilized [management] information tools and reports to identify store trends and issues and to help provide direction for his store team." However, Brody "did not consistently address store trends and issues in a timely manner . . . which resulted in a negative impact on his [profit and loss] and affected overall store profitability." Binns also stated that Brody had not demonstrated "a consistency in utilizing external resources or support services to help him effectively manage and drive the business."

Of Brody and the fourth key responsibility, partner development and team building, Binns stated that Brody's efforts "did not consistently pay off in direct or measurable ways within the store." Delay and hesitancy by Brody "in documenting his conversations resulted in partners not taking him seriously or working to implement the feedback he provided them, which in turn led to an environment where underperforming partners remained in the store significantly longer than desired." Brody "need[ed] to find a way to integrate his leadership style with the tools and resources that he is expected to utilize as a store manager in managing partner performance and providing clear, specific and timely feedback and coaching to partners." He did use existing tools "to provide timely, clear and concise feedback to his partners, both to coach them on their opportunities and to celebrate their successes in a way that is meaningful and actionable for them."

As to developing for the future, one of the five core competencies, Binns stated that Brody had "worked to continuously foster a learning environment in the store where partner development is a priority." He "understood the need to constantly recruit and develop legendary

partners and worked to maintain this focus despite competing priorities." Reiterating concerns expressed in connection with partner development and team building, Binns wrote that Brody's "ongoing opportunity in this area is challenging himself to have timely, candid coaching conversations with his partners and demonstrating an understanding and willingness to document his conversations with them in order to effectively address performance issues and further help them develop."

Turning to achieving measurable results, another core competency, Binns wrote that "[t]his continues to be one of [Brody's] key areas of opportunity. Over the past 6 months, [Brody] has struggled to effectively prioritize and handle his competing priorities in a way that has enabled him to drive consistent measurable results in the store in the key areas of focus." He "struggled . . . to achieve district action plan goals" and to complete goals that he and Binns had set.

With regard to personal learning, the third core competency, Binns stated, "While [Brody] continued to pioneer his own development and work on developing himself on personal time through reading and a mentorship program, he continued to struggle in accepting and implementing feedback about his performance." As to planning and organizing, the fourth core competency, Binns encouraged Brody to focus on developing a system "that will enable him to meet his deadlines and responsibilities, as well as providing him a way of tracking and ensuring complete and timely communication at all levels." Finally, of Brody and the fifth core competency, leadership courage, Binns wrote that Brody had "consistently demonstrated his ability and desire to think outside the box, taking numerous calculated risks to drive his business forward," and "demonstrated a willingness to appropriately challenge the status quo and be a champion for an idea that was new or different." In addition, "for a period of time [Brody]

appropriately challenged his peers and district manager," but "when faced with resistance from his district manager and given feedback based on prior conversations, [he] chose at times to outwardly agree with his district manager rather than voicing differing opinions."  Binns concluded that Brody needed "to recognize that voicing a differing opinion will not hinder his development, yet at the same time understand[] that after complete discussion and review of the information, he may be asked to be aligned with a direction he would not personally choose and may not agree with."

In the spring of 2007, Brody told Binns that he intended to take a leave to have back surgery.  Brody had previously told Binns and his regional manager, Eric Wyatt, that he had back problems.  On April 16, 2007, Brody contacted Starbucks Coffee's Benefits Center and inquired about FMLA leave.  In a talent assessment dated April 17, 2007, Binns gave Brody a "risk assessment" of "yellow."  Later that month, Binns moved, and Guy Booth became Brody's district manager.  In May 2007, Brody informed Booth of his need for a three-month medical leave for back surgery.  According to Brody, Booth responded that the amount of time requested was too long and unfair to other employees at the Brooklyn Center store.  Starbucks Coffee nevertheless approved Brody's request for medical leave from June 2007 to August 2007, and it approved his request to extend his leave to September 2007.  While Brody was on leave, Samantha Gillen replaced Booth as district manager.

One week before Brody began his leave, Starbucks Coffee promoted Francina Janssen, who had been an assistant manager at a different location, to store manager, assigned her to the Brooklyn Center store, and directed her to work with Brody to familiarize herself with the Brooklyn Center store.  During that week and after Brody took leave, Janssen had concerns about Brody's management.  She reported her concerns to Wyatt, and Starbucks Coffee

investigated Brody's management of the Brooklyn Center store.  According to the investigation,

Brody improperly worked from home, occasionally arrived late, scheduled himself for too much

non-coverage time,[3] improperly prepared schedules, shared codes to a scheduling system with

personnel who were not authorized to have the codes, and hired an individual in violation of

Starbucks Coffee's policy regarding employment of relatives of current employees.  In a talent

assessment for July to September 2007, Gillen gave Brody a higher risk assessment of "red."

On September 15, 2007, Brody returned from leave and met with Wyatt.  At that

meeting, Brody first learned of Starbucks Coffee's investigation of him.  Brody denied some of

the allegations made against him, such as sharing codes to the scheduling system with

unauthorized personnel, and explained that he had hired a relative of a current employee with his

district manager's consent.  Wyatt closed the meeting by stating that he would talk to Brody on

the following Monday.

On September 17, 2007, Wyatt and Gregory Sende, the district manager of a district that

included a Starbucks Coffee store in Maple Grove, Minnesota, met with Brody.  Wyatt gave

Brody a final corrective action that stated in part:

> [Brody] had received a previous written corrective action and a 60 day
> Action Plan in Q2 regarding his performance in Communications, Decision
> Making and Standard Operating Procedures from . . . Binns.  [Brody] has been
> inconsistent in his overall performance as a store manager regarding several
> derailing behaviors including but not limited to ineffective & inconsistent
> communications, inappropriate decisions and Starbucks Coffee Operating
> procedures.  This will serve as a final written corrective action for [Brody].
> Failure to successfully meet his Action Plan or any further violations of company
> policy will result in [Brody's] separation from the organization.

The documented coaching conversation and action plan given to Brody by Binns in January 2007

are the previous written corrective action and action plan to which Wyatt referred.  Wyatt

---

[3]     Coverage time refers to time spent on the sales floor of a store; non-coverage time is time spent off the sales floor.

assigned Brody as a store manager to the Starbucks Coffee store in Maple Grove, whose management staff included a store manager, Scott Walsh, and an assistant store manager.

One week later, Sende delivered a ninety-day performance improvement plan to Brody effective as of September 17. The plan called for written documentation of Brody's progress at the end of thirty and sixty days and an overall review at the plan's expiration. The plan stated that failure to satisfy its expectations would result in Brody's termination. Less than three weeks after Sende issued the performance improvement plan, Brody brought this action.

On November 5, 2007, Sende gave Brody the first progress report. Sende's report indicated that Brody had not met many of the expectations set forth in the plan. On November 27, 2007, Sende gave Brody the second progress report. Sende's report indicated that Brody had met some of the expectations; several were not met. On January 2, 2008, the date of the overall review, Sende indicated that Brody had not met the expectations of the performance improvement plan. Starbucks Coffee terminated Brody's employment that day.

## II.   DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether

summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

There are two types of claims under the FMLA: "(1) 'interference' or '(a)(1)' claims in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA and (2) 'retaliation' or '(a)(2)' claims in which the employee alleges that the employer discriminated against him for exercising his FMLA rights." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C. § 2615(a)(1)-(2)); *see Bacon v. Hennepin County Med. Ctr.*, 550 F.3d 711, 714 n.3 (8th Cir. 2008). Here, Brody raises both interference and retaliation claims.

## A.    Interference

In an interference claim, an employee need only show that he was entitled to the benefit denied. *Stallings*, 447 F.3d at 1050. "An employee can prevail under an interference theory if he was denied substantive rights under the FMLA for a reason connected with his FMLA leave." *Id.* However, an employer is not strictly liable for interfering with an employee's FMLA rights. *Id.* at 1050-51; *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977-80 (8th Cir. 2005).[4] "As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her

---

[4]     In his memorandum in opposition to Starbucks Coffee's motion, Brody incorrectly asserts that "employers are strictly liable" for interfering with an employee's FMLA rights. Before Brody brought this action, the Eighth Circuit had rejected this very proposition in *Stallings* and *Throneberry*. Citing *Throneberry*, this Court has stated that "the FMLA does not make employers strictly liable for interfering with employees' FMLA rights." *Bacon v. Hennepin County Med. Ctr.*, Civ. No. 06-2359, 2007 WL 4373104, at *11 (D. Minn. Dec. 11, 2007), *aff'd*, 550 F.3d 711 (8th Cir. 2008). Brody's counsel represented the plaintiff in *Bacon*.

position, the employer will be justified to interfere with an employee's FMLA leave rights." *Throneberry*, 403 F.3d at 979.

"Upon return from FMLA leave, an employee is entitled to be restored to the same position held prior to the beginning of the leave, or its equivalent, in terms of benefits, pay and other terms and conditions." *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006) (citing 29 U.S.C. § 2614(a)(1)); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 991 (8th Cir. 2005) ("Employees who show they qualify for FMLA leave are entitled to be restored to their positions or the equivalent upon returning to work."); 29 C.F.R. § 825.214 (2008) (stating that an employee is "entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment" and that employee is entitled to this reinstatement "even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence").  "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status.  It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority."  29 C.F.R. § 825.215(a) (2008); *see also id.* § 825.215(e) ("An equivalent position must have substantially similar duties, conditions, responsibilities, privileges and status as the employee's original position.").

Brody claims that Starbucks Coffee interfered with his FMLA rights by failing to restore him to the same position he held before his FMLA leave or its equivalent.  Instead of returning him to its store in Brooklyn Center, Starbucks Coffee allegedly demoted Brody by assigning him to its store in Maple Grove.

*Location*

To the extent Brody's interference claim rests on the location of the store where Starbucks Coffee placed him upon his return from FMLA leave, the claim has no merit. "The employee must be reinstated to the same or a geographically proximate worksite (i.e., one that does not involve a significant increase in commuting time or distance) from where the employee had previously been employed." *Id.* § 825.215(e)(1). It is undisputed that Brody's assignment to the Maple Grove store reduced the time and distance of his commute. In his memorandum in opposition to Starbucks Coffee's motion, Brody does not address his shorter commute. Instead, he asserts that "there was no reason that [his] replacement . . . could not [have] been assigned to the Brooklyn Center store on a temporary basis." Brody's argument ignores that the FMLA does not require an employer to reinstate an employee upon return from leave to the same location where the employee worked before the leave, *see id.*, and that "'[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions,'" *e.g.*, *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 812 (8th Cir. 2005) (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994)). Starbucks Coffee did not interfere with Brody's FMLA rights by assigning him to its store in Maple Grove when he returned from leave.

*Position*

Brody claims that Starbucks Coffee interfered with his FMLA rights by failing to restore him to the same position that he held before his leave or its equivalent. It is undisputed that Brody retained the same title, pay, and eligibility for bonuses upon his return from leave. Nevertheless, restoration of salary, title, and benefits is not necessarily restoration to the same position or its equivalent; the duties and functions of the job must be considered. *Cooper v. Olin Corp.*, 246 F.3d 1083, 1091 (8th Cir. 2001).

In this case, the record reveals that deficiencies in Brody's performance led Starbucks Coffee to issue him a final corrective action and place him on a ninety-day performance improvement plan upon his return from leave.  Notwithstanding his performance issues, Starbucks Coffee assigned Brody as a store manager to its Maple Grove store, whose revenue was more than twice that of the Brooklyn Center and whose staff was larger than that of the Brooklyn Center store.  A few days after Brody returned from leave, Sende, Walsh, and Brody met to decide on which responsibilities of managing the Maple Grove store Walsh and Brody would focus.  Walsh's focus included "labor management," "RPO Orders," "training," and "reviews."  Brody's focus included "deployment," "food operations," "duty roster book," and "QASA."  As part of his focus on deployment, Brody was responsible for observing employees' performance, assessing their efficiency, and communicating effective deployment practices to them.  He was responsible for all food operations at the Maple Grove store.  QASA refers to Quality Assurance Store Assessment, which tracks a store's cleanliness.  He was responsible for completing monthly QASA assessments, communicating the results to employees, and formulating plans to redress any deficiencies.  Brody's performance improvement plan required him to communicate daily, weekly, monthly, and quarterly goals to employees.  He was specifically assigned several employees with whom he was required to have bi-weekly meetings to discuss whether the employees were meeting expectations.  During Brody's tenure at the Maple Grove store, the store received an award.  Although the store received the award based on its performance before Brody worked there, a ceremony and plaque credited both Brody and Walsh as the store managers of the Maple Grove store.

Brody contends that Starbucks essentially demoted him by assigning him to its Maple Grove store, which already had a store manager.  Citing his deposition testimony and his

declaration, he asserts that he had less responsibility and authority at the Maple Grove store because he "did not have the authority to coach/discipline employees or give performance reviews."  With regard to performance reviews, Brody does not dispute that he, Walsh, and Sende agreed that Walsh would focus on employee reviews.  *Cf.* 29 C.F.R. § 825.215(e)(4) ("FMLA does not prohibit an employer from accommodating an employee's request to be restored to a different shift, schedule, or position which better suits the employee's personal needs on return from leave, or to offer a promotion to a better position.").  Moreover, their decision appears to reflect the schedule of reviews at Starbucks Coffee.  Starbucks Coffee usually conducted reviews in April or May, near the midpoint of its fiscal year, and in September or October, near the end of its fiscal year.  Having returned from leave in mid-September 2007, Brody would have had to conduct performance reviews of employees at a store where he had not previously worked upon or shortly after his return from leave.  Having worked at the Maple Grove store, Walsh was familiar with the employees there.  With regard to disciplining employees, Brody's conclusory, self-serving assertion does not raise a genuine issue of material fact in light of his acknowledgement at his deposition that he could, in fact, "talk" to employees who were doing something wrong; his recognition at the Maple Grove store as a store manager; the communication with employees required of him by his responsibilities at the Maple Grove store; and repeated admonishments during the performance improvement plan to communicate with his employees regarding expectations and their performance.  *See Smith v. Int'l Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008) (stating that plaintiff may not raise genuine issue of material fact by merely pointing to unsupported self-serving allegations).

Brody also contends that he had no involvement in management decisions at the Maple Grove store.  In support, he cites his declaration where he states that Sende "never included

[Brody] in . . . the monthly MBDD (Manager Business Development Day) meetings [Sende] held with . . . Walsh at the Maple Grove store."  Brody describes the meetings as occasions for a store manager and district manager to discuss all store operations and to make decisions regarding staffing, sales goals, and food orders.  Starbucks Coffee notes that Brody did not mention at his deposition his alleged exclusion from MBDDs by Sende and that Brody thought that MBDDs occurred quarterly.[5]  Moreover, Brody had substantial involvement in the management decisions at the Maple Grove store.  For instance, Brody was responsible for all food operations.  On this record, Brody's conclusory, self-serving assertion that he was excluded from the management decisions at the Maple Grove store does not raise a genuine issue of material fact.  *See id.*

The Court turns to the remaining points raised by Brody to support his contention that he was not reinstated to the same or equivalent position.  First, he claims that he did not receive his own code to the Maple Grove store's alarm; he used someone else's alarm code.  The alleged failure to give Brody his own code does not raise a genuine issue of material fact as to whether Starbucks Coffee failed to properly reinstate Brody.  *See* 29 C.F.R. § 825.215(f) ("The requirement that an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis, intangible, or unmeasurable aspects of the job.").

Next, Brody claims that he was not able to set his own schedule or the schedules of the Maple Grove store's employees.  Brody does not claim that Starbucks Coffee failed to return him to an equivalent work schedule, *see id.* § 825.215(e)(2) ("The employee is ordinarily entitled to return to the same shift or the same or an equivalent work schedule."), and he fails to

---

[5]      The Court notes but draws no conclusion from the fact, not mentioned by either party, that MBDD appears in Brody's daily planner on October 2, 2007.

acknowledge the presence of another store manager at the Maple Grove store with whom Brody had to coordinate schedules and whose focus included, pursuant to an agreement with Brody, "labor management." Thus, he has not raised a genuine issue of material fact as to whether his position at the Maple Grove store was equivalent.

Third, Brody claims that his assignment to the Maple Grove store "interrupted his ability to go forward and develop, a/k/a be promoted." Brody has not offered any evidence to support his belief that his assignment to the Maple Grove store adversely affected his development at Starbucks Coffee. Brody's unsupported, conclusory assertion that his assignment to the Maple Grove store interfered with his promotion prospects does not raise a genuine issue of material fact as to whether Starbucks Coffee properly reinstated him.

Finally, Brody maintains that Starbucks Coffee reinstated Brody knowing that he would not be employed after the expiration of his performance improvement plan.[6] According to Brody, Wyatt stated the day before Brody started to work at the Maple Grove store that Brody would work there through the holidays, a time that coincides with the expiration of his performance improvement plan. "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." *Id.* § 825.216(a). In the months before Brody's leave, Starbucks Coffee had concerns about Brody's performance. During his leave, Starbucks Coffee discovered additional cause for concern about Brody's performance and placed him on the

---

[6]     In support of this argument, Brody cites the dissent of an unpublished decision issued by a circuit other than the Eighth Circuit, but his memorandum does not disclose that he cites the dissent. At the motion hearing, Brody's counsel admitted that she was "very aware" that the memorandum had cited the dissent. That the memorandum cited the dissent was clearly disclosed, she claimed, because Brody's motion papers included a copy of the case. The Court expressly disapproves of this practice. An appropriate parenthetical must appear whenever a case is cited for a proposition other than the holding of a majority of the court. *Cf. Bacon*, 2007 WL 4373104, at *13 n.17; Minn. R. Prof. Cond. 3.3.

performance improvement plan after he returned from leave.  There is no evidence that Starbucks Coffee presumed Brody's failure to successfully complete the performance improvement plan.  Wyatt's alleged statement reveals that Starbucks Coffee would make a decision about Brody's future at Starbucks Coffee upon the expiration of the performance improvement plan.  Brody's speculation to the contrary does not raise a genuine issue of material fact.

In short, the record, viewed in the light most favorable to Brody, reveals that Starbucks Coffee did not interfere with Brody's FMLA rights by assigning him to the Maple Grove store as a store manager.  The Court grants Starbucks Coffee's motion insofar as it relates to Brody's interference claim based on the position he held after his return from leave.

*Notice*

Brody claims that Starbucks Coffee interfered with his FMLA rights by failing to give him notice of those rights.  Citing evidence demonstrating that Starbucks Coffee gave Brody notice of his FMLA rights, Starbucks Coffee moves for summary judgment on this claim.  In a one-sentence footnote in his memorandum in opposition to Starbucks Coffee's motion, Brody states that he "voluntarily dismisses" this claim.  The Court understands Brody's response to concede that summary judgment on this claim in favor of Starbucks Coffee is appropriate.[7]  The Court grants Starbucks Coffee's motion accordingly.

---

[7]     Brody did not cite Rule 41(a)(2) of the Federal Rules of Civil Procedure, and he did not address the factors that govern voluntary dismissals.  *See Cahalan v. Rohan*, 423 F.3d 815, 818 (8th Cir. 2005); *Witzman v. Gross*, 148 F.3d 988, 992 (8th Cir. 1998).

B.      **Retaliation**

*Final corrective action, performance improvement plan, and termination*

Brody claims that Starbucks Coffee retaliated against him for exercising his FMLA rights

by issuing him a final corrective action and placing him on a performance improvement plan

upon his return from leave and terminating his employment.  The parties agree that Brody's

retaliation claims should be addressed under the burden-shifting framework of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Phillips v. Mathews*, 547 F.3d 905, 912 (8th

Cir. 2008).  Brody must first establish a prima facie case of retaliation.  *See id.*  To establish a

prima facie case of retaliation, Brody must demonstrate that he exercised rights afforded by the

FMLA, that he experienced an adverse employment action, and that there is a causal connection

between the exercise of his FMLA rights and the adverse employment action.  *See id.*  If Brody

establishes a prima facie case, then Starbucks Coffee must "come forward with evidence of a

legitimate, nondiscriminatory reason for the adverse action."  *See id.*  If Starbucks Coffee does

so, then Brody must come forward with evidence that Starbucks Coffee's proffered reason is

pretext for retaliation.  *See Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir. 2002).

Starbucks Coffee contends that Brody cannot demonstrate a causal connection between

his exercise of FMLA rights and the alleged adverse actions.  Brody responds that Starbucks

Coffee issued a final corrective action and placed him on a performance improvement plan

immediately after his return from leave.  Due to the close temporal proximity, Brody contends

that he established a prima facie case.  For present purposes, the Court assumes that Brody

established a prima facie case.  *Cf. Phillips*, 547 F.3d at 912 n.4.

Starbucks Coffee explains that it issued the final corrective action and placed Brody on

the performance improvement plan because Starbucks Coffee had concerns about his

performance before his leave, had placed him on an action plan in January 2007, and discovered

further cause for concern about his performance during his leave.  Brody attempts to demonstrate

that the goals and tasks in the performance improvement plan were not reasonable because he

did not have sufficient time to complete them.  According to Brody, Sende testified that the goals

and tasks required eight to ten hours per week of non-coverage time, and Brody's schedule at the

Maple Grove store never included that amount of non-coverage time.  Notwithstanding Brody's

assertions, Sende testified that the goals and tasks required eight to ten hours per week.  Sende

did not testify that all of that time had to be non-coverage.  In addition, Brody's daily planner for

October 2007 reveals that he had 14.25 hours of non-coverage time the week of October 1; 8.5

hours the week of October 8; 5.5 hours the week of October 15; and 8.5 hours the week of

October 22.  With regard to Brody's attempt to demonstrate that Starbucks Coffee's proffered

reasons are pretext for retaliation because the goals and tasks of the performance improvement

plan were not reasonable, the record does not support his assertions.

Brody next argues that Starbucks Coffee's proffered reasons are pretext for retaliation

because Starbucks disregarded its progressive disciplinary policy.  According to Brody, Binns's

documented coaching conversation was the first step in Starbucks Coffee's policy.  Corrective

action should have followed it, followed by final corrective action.  Because Starbucks Coffee

issued a final corrective action upon his return from leave, Brody argues, Starbucks Coffee

skipped a step in its progressive disciplinary policy.

Starbucks Coffee responds that its disciplinary policy does not mandate progressive

discipline:

> Corrective action may take the form of a verbal warning, a written
> warning, demotion, suspension or termination from employment.  The form of
> corrective action taken will depend on the seriousness of the situation and the
> surrounding circumstances. . . . *There is no guarantee that a partner will receive*

> *a minimum number of warnings prior to termination of employment or that*
> *corrective action will occur in any set manner or order.*

(Emphasis added.)  Thus, Starbucks Coffee's disciplinary policy does not support Brody's

contention that Starbucks Coffee deviated from it.  Moreover, even if Starbucks Coffee deviated

from a progressive disciplinary policy, Brody has not offered any evidence that Starbucks Coffee

departed from the policy because of his exercise of FMLA rights.  Brody therefore has not raised

a genuine issue of material fact as to whether Starbucks Coffee's proffered reasons for issuing

the final corrective action and placing him on a performance improvement plan were pretext for

retaliation.  *See Richey v. City of Independence*, 540 F.3d 779, 786 (8th Cir. 2008) (stating that

employer may disregard its personnel policies as long as it does not unlawfully discriminate in

doing so; disregard of personnel policies, standing alone, is not evidence of discrimination);

*Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007) ("Because there is no evidence that

Target did not follow its policy because of Carraher's age, its alleged failure to follow policy

does not give rise to an inference of age discrimination."); *Haas v. Kelly Servs., Inc.*, 409 F.3d

1030, 1036 (8th Cir. 2005) (stating that employer can choose how to run its business, including

not to follow its own policies, as long as it does not unlawfully discriminate in doing so); *Allen*

*Health Sys.*, 302 F.3d at 835 ("[S]ince Smith has pointed to no other employees who were treated

differently under the progressive discipline policy, Allen's failure to give written warning does

not tend to prove that the reason given for her firing was pretextual."); *cf. Bell v. Conopco, Inc.*,

186 F.3d 1099, 1102 (8th Cir. 1999) (holding genuine issue of material fact existed on each

element of racial discrimination and retaliation claims based, in part, on evidence from which

factfinder could infer plaintiff's supervisor had discriminatory motive for discharging and failed

to comply with progressive disciplinary policy).  The Court therefore grants Starbucks Coffee's

motion with respect to Brody's claim that Starbucks Coffee retaliated against him by issuing a final corrective action and placing him on a performance improvement plan.

With regard to Brody's termination, Starbucks Coffee asserts that it terminated him because he failed to successfully complete his performance improvement plan. Brody repeats his assertion, addressed above, that he did not have enough time to complete the goals and tasks in the performance improvement plan. For the reasons set forth above, Brody failed to raise a genuine issue of material fact as to whether Starbucks Coffee's proffered reason for his termination is pretext for retaliation. Accordingly, the Court grants Starbucks Coffee's motion with respect to Brody's claim that Starbucks Coffee retaliated against him by terminating his employment.

### *Maple Grove*

As an alternative to his interference claim, Brody claims that Starbucks Coffee retaliated against him by placing him in the Maple Grove store. His claim regarding his placement upon his return from leave is properly analyzed as an interference claim. *Cf. Stallings*, 447 F.3d at 1051 ("Confusion often arises as to whether an employee's FMLA claim 'is really about interference with his substantive rights, not discrimination or retaliation.'" (quoting *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005))). Even if the claim is appropriately addressed as a retaliation claim, it fails because Brody's placement in the Maple Grove store was not an adverse employment action.

**III.    CONCLUSION**

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.      Starbucks Coffee's Motion for Summary Judgment [Docket No. 17] is
        GRANTED.

2.      This case is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 26, 2009

                                                s/  Joan N. Ericksen
                                                JOAN N. ERICKSEN
                                                United States District Judge